E276higs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          13 CR 316(JPO)

 5   DANIEL HIGHTOWER,

 6              Defendant.

 7   ------------------------------x

 8                                     New York, N.Y.
                                       February 7, 2014
 9                                     11:30 a.m.

10

     Before:
11
                      HON. J. PAUL OETKEN,
12
                                       District Judge
13

14                    APPEARANCES
     PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16   MEGAN L. GAFFNEY
         Assistant United States Attorney
17
     FEDERAL DEFENDERS OF NEW YORK
18       Attorneys for Defendant
     PEGGY CROSS-GOLDENBERG
19

20

21

22

23

24

25
```

E276higs

1              (In open court; case called)

2              THE DEPUTY CLERK:  Starting with the government, can I

3    have counsel state their appearance for the record.

4              MS. GAFFNEY:  Good morning, your Honor.  Megan Gaffney

5    for the government.  With me at counsel's table with your

6    Honor's permission is Roselyn Sutton, who is an intern with our

7    office.

8              THE COURT:  Welcome.  Good morning.

9              MS. CROSS-GOLDENBERG:  Federal Defenders of New York

10   by Peggy Cross-Goldenberg for Mr. Hightower.  Good morning,

11   your Honor.

12             THE COURT:  Good morning.

13             We're here today for the imposition of sentence in

14   this case.  Mr. Hightower pleaded guilty on September 5th of

15   last year to one count of assault on a mail carrier causing

16   bodily injury in violation of 18, U.S.C., 111(a)(1)(B), which

17   is a felony under federal law, a Class C felony.  I want to

18   start by making sure that I reviewed everything I should have.

19             In preparation for today reviewed the presentence

20   report submitted by the Probation Department with an addendum

21   and the sentencing recommendation.  That also includes a

22   statement from the victim of the assault.  I have also reviewed

23   the submission by defense counsel dated February 3rd, along

24   with an attached psychological report, a letter from Mr.

25   Hightower, and letters from his mother and a friend and

E276higs

1    submission by the government dated January 23rd.

2              Do I have everything I should have?

3              MS. GAFFNEY:  Yes, your Honor.

4              MS. CROSS-GOLDENBERG:  Yes, your Honor.  Thank you.

5              THE COURT:  Ms. Cross-Goldenberg, have you read the

6    presentence report and discussed it with your client?

7              MS. CROSS-GOLDENBERG:  Yes, your Honor.

8              THE COURT:  Mr. Hightower, have you read the

9    presentence report and discussed it with your attorney?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Ms. Gaffney, have you reviewed the

12   presentence report?

13             MS. GAFFNEY:  Yes, your Honor.

14             THE COURT:  Are there any objections to the

15   presentence report?

16             MS. GAFFNEY:  Not from the government, your Honor.

17             MS. CROSS-GOLDENBERG:  No, your Honor.

18             THE COURT:  I hereby adopt the facts set forth in the

19   presentence report as my findings of fact.  The starting point

20   in any sentence decision in the federal system is the

21   Sentencing Guidelines, which is a book that contains the

22   recommended sentence based on the base offense level, type of

23   crime and criminal history category, the criminal background of

24   any defendant when you put them together there is a recommended

25   range of incarceration and any other applicable punishment.  I

E276higs

1    ma not required to follow the Sentence Guidelines.  They are

2    advisory at this point, however, it is necessary to start with

3    that calculation.  It is the starting point for any sentencing

4    decision.  So I want to start by making sure I have a correct

5    and accurate calculation of the guidelines.  In this case there

6    was a plea agreement in which the parties stipulated to a

7    calculation of the guidelines and that appears to be in

8    accordance with the presentence report calculation.

9         Based on the parties' agreement and my independent

10   evaluation of the guidelines, I accept the guideline

11   calculation in the presentence report.  I have used the

12   sentence guideline manual in effect November 1st, 2013.

13   Although, I believe it is consistent with the prior version of

14   the guidelines calculation.  The base offense level is 14 under

15   Section 2A2.2 because the victim sustained permanent life

16   threatening bodily injuries from the assault.  There is an

17   increase of seven points under 2A2.2(b)(3)(C).  The conviction

18   involved violation a 18, U.S.C., Section 111(b) and therefore

19   there is an increase of two additional points under that

20   provision.  So that is 23 points.  However, the defendant

21   accepted responsibility and so there is a reduction of three

22   points.  The total offense level is 20 under the guidelines and

23   the defendant is in criminal history category three given his

24   two prior convictions.  So Roman numeral three is the criminal

25   history.  Therefore, the guideline range is 41 to 51 months'

E276higs

1    incarceration.

2            I have read all the submissions I mentioned earlier,

3    but I would like to give defense counsel an opportunity to

4    speak on behalf of the defendant if there is anything you would

5    like to add.

6            MS. CROSS-GOLDENBERG:  Thank you, your Honor.  There

7    are just a few things I would like to offer the Court and I

8    know that Mr. Hightower actually he can probably cover them

9    better than I can, but he would like to address the Court as

10   well.

11           Your Honor, as I indicated in my letter I think the

12   guideline range in this case of 41 to 51 months is sufficient

13   but not greater than necessary to affect the statutory

14   sentencing objectives.  Section 3553(a) requires consideration

15   of factors that don't always interplay in a very neat way.  We

16   have to consider the need for punishment, the need for

17   rehabilitation, the need for protection in the community and

18   the need for deterrence and those things sometimes bear no

19   relation to each other in terms of what the appropriate

20   sentence will be.

21           In order to answer the alternate question of how much

22   type is sufficient but not greater than necessary, we have to

23   look at the nature and circumstances of the offense, which

24   obviously were quite serious in this case as well as the

25   history and characteristics of Mr. Hightower, the guidelines

E276higs

1   and the need for treatment and other services that can go to

2   the goals of sentencing.

3           So I would like your Honor to start with the nature

4   and circumstances of the offense.  As I indicated, this is a

5   horribly serious offense.  As Mr. Hightower wrote in his letter

6   to the Court, he knows that he made a terrible, terrible

7   mistake that day, that it was a terrible thing.  It will haunt

8   him forever and he understands that that is nothing compared to

9   the pain and suffering that he inflicted in this case.  Really

10  he knows he can only imagine how bad that is.

11          I don't want anything that I say to be taken to

12  minimize both his understanding and the actual facts of what

13  occurred in this case.  I do want the Court to know that he has

14  repeatedly asked me throughout the course of this case for an

15  opportunity to apologize.  And in terms of the way things are

16  structured, today really is the time for that and so I know

17  that he wants to speak to that.

18          I guess the next thing that I want to get to in light

19  of the nature and circumstances of the offense is the

20  guidelines in this case.  I think your Honor that the

21  guidelines do adequately consider the factors and the nature

22  and circumstances of this offense.  As the Court knows from

23  reviewing the guidelines, the base offense level in this case

24  starts at a 14.  If it was a more minor assault, the base

25  offense level would have been a seven.  So already the base

E276higs

offense level accounts for some degree of seriousness of the case. Section 2A2.2 gives us the opportunity for between three and seven points to be added for the degree of injury and in this case the highest level of points were added because as I said it was a serious case and the injuries were serious.

Mr. Hightower acknowledges that. He signed the plea agreement. He accepted that highest level of enhancement that is contained in the guidelines. The guidelines also added additional two points because of the bodily injury that was suffered. That is what 18, U.S.C., 111(b) does. So you have nine points that are added to reflect the seriousness of the injuries in this case.

I don't intend that they can be quantified, but to the extent that the guidelines are an attempt to treat like cases alike and to factor in all the nature and circumstances of the offense, I think it is worth noting that without those additional points -- for those nine additional points based on the injuries, the total offense level in this case would only be a 12. Even in Mr. Hightower's criminal history category, the recommended sentence would be 15 to 21 months. The guidelines in this case more than double that to 41 to 51 months. So I think they do adequately take into account to the extent that any type of quantification can, they take into account what occurred in this case. Again, I don't say that to minimize anything, but I say that as we consider the law on

E276higs

1    this case I think that the guidelines do account for those

2    things.  They account for both the kinds and the degree of the

3    injuries that were suffered in this case.

4         So, your Honor, that brings me to the history and

5    characteristics of Mr. Hightower.  I know the Court has read

6    Dr. Drob's report and I thank the Court for that.  I just want

7    to say in a case like this it seems critical to me to

8    understand if we are to understand how a possible sentence can

9    be fashioned to address those 3553 factors to understand sort

10   of what went into this and where it came from as a means of

11   figuring out how to prevent this from happening again and what

12   sort of not only punishment but also rehabilitation or

13   treatment is necessary.

14        I think, your Honor, in a situation like this someone

15   who needs the serious treatment that Mr. Hightower needs, jail,

16   which is the sort of the easiest way to quantify a sentence,

17   doesn't address the needs in this case.  It certainly can keep

18   him locked up, but it can't address the need for future

19   protection of the community or deterrence or the rehabilitation

20   that he needs.  As Dr. Drob indicates in her report, Mr.

21   Hightower suffers from serious psychological problems.  He

22   suffers from posttraumatic stress disorder, mood disorder, from

23   alcohol abuse, from mixed personality disorder.  A lot of these

24   issues arise out of the beatings that he himself suffered as a

25   child.  That is not any kind of excuse and I know he opened his

E276higs

1    letter to the Court by saying he doesn't want to be excused for

2    what he went through in his childhood, but it the posttraumatic

3    anxiety and irritability and hypervigilance that all sort of

4    factors in.

5            When he explains to me these blackouts that he

6    encounters, he doesn't know why it happens.  He is not a

7    doctor, but he has come to understand how a little thing that

8    to an outside observer would seem irrational or completely out

9    of proportion can set him off into this blackout stage where

10   all he sees is his father and he feels this need to protect

11   himself against the beatings that his father inflicted on him

12   he hears the sort of taunting of his father to be a man and to

13   protect himself and use his fists.  I don't say any of that as

14   an excuse but only to give Court a little insight into how his

15   brain works.

16           THE COURT:  Sorry to interrupt.  I want to ask you

17   about when we talk about treatment in this setting, we usually

18   talk about a special condition of supervised release of

19   treatment after a term of incarceration.  I think probably

20   everyone recognizes that a significant term of incarceration is

21   necessary among others things to reflect the seriousness of the

22   crime and for the goal of protecting the public and specific

23   deterrence.  There are different levels of medical treatment

24   within BOP and all I can do is recommend these things and maybe

25   there are scepticism about the kind of treatment that is

E276higs

1   available in Bureau of Prisons, but what about a recommendation

2   that he undergo?  There is something called a Level Three,

3   which is a more intensive treatment, which is only available in

4   certain facilities.  Is that something that you think would

5   make sense during the term of incarceration?

6        MS. CROSS-GOLDENBERG:  Well, your Honor, in our

7   experience there isn't the type of treatment within the BOP

8   that really would address these issues.  Our experience with

9   people who have gone to level-three care facilities when it is

10  not like a very bad physical condition that they get help for

11  have been situations where the individual is mentally retarded

12  or suffers from some sort of severe mental defect where they

13  need the medical attention.  So I have not come across a

14  facility that would be able to address this kind of treatment.

15        Now, that said there is the residential drug and

16  alcohol treatment program and we would ask the Court to

17  recommend that Mr. Hightower participate in that.  I think that

18  is a start to the extent that he has been self-medicating with

19  alcohol and needs all the assistance he can to battle that

20  alcohol dependency; but in terms of the really, like,

21  psychotherapy and the anger management and the intensive

22  treatment that he needs, as far as we understand that can only

23  happen once he is released.  I understand as I said the months

24  in prison is the thing that can be most easily quantified in

25  terms of saying how seriously do we take this case, but I think

E276higs

1   that doing that or piling extra months on is counterproductive

2   in this case because I watched Mr. Hightower struggle while he

3   has been in the MDC for almost a year now and it is not a place

4   where you can work on these kinds of mental issues.  It is a

5   place that requires hypervigilance and really exceeds into the

6   issues that he has.

7           THE COURT:  You mentioned RDAP program.  I think he

8   may not be eligible because it is a violent offense; is that

9   right?

10          MS. CROSS-GOLDENBERG:  The way I understand it, your

11  Honor, he is eligible for participation but he will not be able

12  to receive time off his sentence.  Actually, I think that says

13  a lot about his insight that he has into his needs and into

14  really the extent that asking for help and recognizing how bad

15  you need help is an important first step to having any of that

16  help work.  He realizes that he is not going to get a year off

17  his sentence in this case if he completes the RDAP program.  It

18  is really just something that he wants to do because he knows

19  he needs the help.

20          THE COURT:  He had alcohol treatment in one of his

21  prior incarceration I think and I don't think he found it

22  helpful according to the presentence report.

23          MS. CROSS-GOLDENBERG:  I don't think it was anything

24  as intensive as the RDAP program, which is a 500-hour program

25  residential, basically around-the-clock treatment program.  I

E276higs

1    think, your Honor, that is one of the things that Dr. Drob

2    talked about is how long-term monitoring and treatment is

3    really what is going to be necessary here.

4          As the Court may know, we now have a social work team

5    in our office and Mr. Hightower has been working with them

6    since last spring.  As I mentioned in my letter almost

7    immediately following his arrest, he reached out to me.  He

8    brought up what goes on in his head and these demons that he

9    fights and beg for help.  Unfortunately we couldn't get him any

10   kind of counseling or therapy while he is at the MDC, but we

11   were able to have him work with our social work team.  Once we

12   know his approximate release date, we'll be able to work out if

13   what Probation can offer in terms of treatment is not going

14   enough, our social work team can step in and help him with the

15   additional services that he will need.

16         One important thing.  His family has moved to

17   Pennsylvania.  He hopes to live with them in Pennsylvania when

18   he is released.  So it may be that we'll need to work with the

19   Probation Department there, but certainly it worked with other

20   districts before.

21         One thing that Dr. Drob said that really struck me was

22   that of this entire incident makes little sense without the

23   context of the extreme interpersonal sensitive conditioned by

24   the disorders that he suffers.  I think reading the

25   government's letter, reading the presentence report and in

E276higs

1    considering all that, I think that is the question that

2    everyone has that this doesn't make sense -- Why did this thing

3    happen?  I hope that her report and the results of the testing

4    that she was able to do give some insight into the only way

5    that this makes sense.  The reason I think that is so important

6    is that if in order to serve the sentencing objectives of

7    deterrence and protection of the community and truly to

8    recognize the seriousness of the offense, I think the

9    appropriate sentence has to include that sort of intensive

10   long-term treatment.  It just won't happen while he is

11   incarcerated.

12           I did just want to take one moment, your Honor, to

13   just respond to sort of the characterization of the

14   government's letter of Mr. Hightower is a person who has a

15   problem with violence against women.  I think, your Honor,

16   although I understand why a stranger could look at the paper

17   trail and come to that conclusion, I think that is a real

18   misreading of Mr. Hightower's record.

19           The first case, your Honor, his first conviction as I

20   understand it started as simply people going to a home to

21   purchase marijuana and another codefendant was the one who

22   initiated the robbery and committed the violence.  So Mr.

23   Hightower was arrested and convicted because he was there with

24   him; but in terms of instigating the violence or directing any

25   of it at a woman, he had no role in that.  His other conviction

E276higs

1    is for possession of a firearm.  Your Honor, his views of women

2    are his history with women simply can't play a role in this

3    case.  It was as he describes it, and I think I recounted this

4    in my letter, it was no fault of anyone's other than his; but

5    he had been drinking, he was in a upset mood and that is the

6    trigger that sets him off and he was afraid that the mail

7    carrier could see into him, knew that he had been drinking and

8    judged him and thought he was a bad person.  That is the kind

9    of thing that triggers the blackout state where he feels he is

10   protecting himself from his father.  As I said that is where

11   the cycle can be broken if he gets treatment to deal with that.

12        I think as I mentioned that the insight that he has

13   attained is important because this is not simply his attorney

14   telling the Court that these are the things he needs.  These

15   are the things that he has asked for.  I think one of the

16   things Dr. Drob mentioned in her report is that she had given

17   him some -- she couldn't treat him.  It wasn't a situation

18   where she could have repeated therapy sessions with him, but

19   she gave him some techniques he could use in terms of anger

20   management or stop-thought techniques and he has been really

21   attempting to employ those at the MDC and I have been able to

22   watch his commitment to that and sort of his struggle with it.

23        Your Honor, he is still horrified by what he did as I

24   am sure everyone in this room is.  He never, ever, ever wants

25   to do anything like this again.  He obviously is sad because he

E276higs

1    is away from his family and missing his daughter's life, but

2    that isn't even a factor in what upsets him so much.  He knows

3    what it is like to be the victim of abuse and he is horrified

4    that he has inflicted that trauma on someone else.  He doesn't

5    want to do that again.  He is craving the help that will help

6    him overcome posttraumatic stress and the other psychological

7    issues that he can't battle on his own.

8            So, your Honor, in light of all these factors, I think

9    that the guidelines range of 41 to 51 months is the appropriate

10   range in this case and that a sentence within that range does

11   adequately factor in all of the sentencing factors and really

12   anything more than that range would be a greater prison term

13   than is necessary because it actually would be

14   counterproductive to the other goals of sentencing.

15           Thank you, your Honor.

16           THE COURT:  Thank you.

17           Mr. Hightower, if there is anything you would like to

18   say today, you may do so now.  Speak into the microphone.

19           MS. CROSS-GOLDENBERG:  Do you want him to stand, your

20   Honor?

21           THE COURT:  You can stay seated if you would like.

22   Either one.  Whatever you are comfortable with.

23           THE DEFENDANT:  First off, your Honor, I would like to

24   say I deeply apologize from my heart to the victim for any pain

25   I caused her, any inconvenience I caused her to her work, her

E276higs

1   job and to her family too because I know like Ms. Peggy said

2   everyone want to know why I picked her or why I did what I did

3   to her.  It wasn't intentional.  I didn't, like I said, I went

4   out to hurt her.

5          THE COURT:  Do you remember it?

6          THE DEFENDANT:  A little bit, your Honor.  Like a

7   remember a little of it.  I know I was upset that day.  I was

8   drinking that day, got out of line.  I also read that she was

9   traumatized for my actions.  I understand where she is coming

10  from and I deeply apologize for that, too, for the simple fact

11  is a was traumatized since I was five years old to where my

12  father beat me like I was a grown man.  I had blood clots in my

13  head and from then on I watched him beat my mother physically.

14  And right there she said, Oh, you shouldn't want to do that to

15  anybody.  We watch as the years go on.  It was like I was a

16  sponge.  This is what I see.  This is what I know.  When I get

17  upset, this is who I see, your Honor, my father's face and I am

18  going to try to protect myself from any harm because I am not a

19  kid no more.  I can stop him.  He cannot hurt me.  I am strong.

20  I can protect myself.  This is what I see.  I just black out

21  when I get upset.  The only person who was able to snap me out

22  of certain things when I was around was my mother.  She was

23  like my psychiatrist, my medication, my mother.  She has always

24  been there for me no matter what, no matter what I do she is

25  there.  She is right now today.  33 years old she is still

E276higs

1    here.

2              Back to my situation.  I do feel like I get over upset

3    to where when I snap back to reality from what I done from my

4    anger, the damage is there and all apologizes, sorries is not

5    going to change what I did.  I deeply apologize for that.  She

6    had nothing to do with my anger.  Like I said, it is a moment

7    to where I felt a threat.  A person can give me a body

8    language, person can give me a messed up look and I snap.  I do

9    realize that, your Honor.  I take full responsibility for that.

10             I am also looking for help.  I only have my father.

11   When Ms. Peggy -- when I was telling Ms. Peggy about my

12   situation and she sent the psychiatrist to come see me, you

13   know, she gave me cues to do, count from 100, breathe.  She

14   told me to put a stop sign mirror of myself.  While I am in

15   jail, I protect myself.  And these are strangers, I don't know,

16   as the lady was.  I don't know her.  I don't have no friends in

17   there.  I don't talk to them.  I stay to myself.  I do that

18   because I don't want to look like this horrible person that I

19   am pointed out as today beating people up.  That is not the

20   case, your Honor.

21             Yes, I had little problems with my kid's mother and my

22   wife, order of protection thing.  That is a whole different

23   story.  There it is more too it.  I do have a problem, your

24   Honor.  Sometimes I am really depressed.  I get into this mood

25   to where I don't want to be bothered by anybody.  When I sleep,

E276higs

1    I think about my past and all the bad I did.  Right now today I

2    feel even worse.  The fact is I am here again in jail again

3    hurting not only myself but my family too.

4         I have four kids.  They are growing up.  I am going to

5    miss more of their life because of my stupidity because I don't

6    know how to control my anger.  I am not looking for any pity.

7    I already know what is going to happen.  I know what is going

8    on today.  I have been through it already.  I don't want anyone

9    feeling sorry for me.  I know there are females in here and

10   they are thinking, Oh, God, this guy is no good.  Keep him

11   locked away for good.  I apologize for that to all the females

12   in this room.  It was a female that was hurt.  I really, really

13   am sorry to the woman that I hurt and maybe I know she is not

14   going to forgive me.  Hopefully one day she will get over

15   traumatization -- I think I am saying that right -- of what I

16   have done to her.

17        Like I said before, your Honor, I know what I did, I

18   know I hurt her bad.  I am ready to take my punishment for it.

19   I know I am not going home.  I know the rules.  I want to let

20   everyone know what is going on in my head and why I did what I

21   did.  Ms. Peggy, she did the best she could do for me.  Like I

22   said, I don't want anybody to feel sorry for me.  I do

23   apologize.

24        THE COURT:  Thank you.

25        THE DEFENDANT:  Thank you for the time to speak.

E276higs

1              THE COURT:  Thank you.

2              Ms. Gaffney, if is there anything you would like to

3      say, you may.  I read the government's submission.  If there is

4      anything you would like to add, you may.

5              MS. GAFFNEY:  Yes, your Honor, briefly.  As you know

6      from reviewing our submission, the government feels this is

7      that exceptional case that warrants an upward variance from the

8      sentencing guideline range here.  When the government submitted

9      its papers on this, we didn't have the benefit of the

10     defendant's submission, psychological report or the arguments

11     that we have heard today.  I want to center my argument on just

12     what we have learned from the submission and what the arguments

13     have been here today and tie that to the 3553(a) factors, which

14     upon reviewing the defendant's submission and hearing the

15     defendant's arguments today, actually cuts in favor of that

16     upward variance in a number of categories under 3553(a).

17             First, affording adequate deterrence to criminal

18     conduct, which is one of the factors.  We hear today and it was

19     noted in the submission that Mr. Hightower is now taking full

20     responsibility for his actions.  It was a terrible mistake.  He

21     wants to apologize.  Here is where it is helpful to look at the

22     history of this case.  He was arrested in the spring and the

23     defense has argued to beg for help in the spring.

24             MS. CROSS-GOLDENBERG:  Can i just ask you to speak

25     into the microphone.  I am having a hard time hearing you.

E276higs

1          MS. GAFFNEY:  Sure.

2          He begged for help in the spring allegedly with his

3     anger management problem, but he didn't plead guilty in this

4     case until the fall.  In fact, he assisted on getting DNA

5     results to prove that he was the one involved in this offense.

6     His plea only came after we conclusively determined through

7     forensic evidence that it was the victim's blood on his shoe

8     that tide him to the offense.  So whatever his apologies and

9     his accepting responsibility, it only came after the evidence

10    was overwhelming that he was involved in this assault.

11         Second, on the point of rehabilitation and treatment

12    for the defendant.  As your Honor has recognized, the BOP has

13    procedures and help in place to assist defendants who need a

14    full range of mental health treatment.  This is a

15    representation the BOP has made in their documents.  They

16    provide a full range of mental health treatment through staff

17    psychologists and psychiatrists.  They have psychologists

18    available for formal counseling and treatment on an individual

19    or a group basis and in addition they have staff in the

20    inmates's housing unit that are available for more informal

21    counseling.  They also have a number of substance abuse

22    programs in place for inmates.  For instance, drug abuse

23    education and programs your Honor has referenced to assist

24    inmates while they are incarcerated to address both their

25    mental health concerns and their substance abuse concerns.

E276higs

```
 1              If you look at the psychological report that was
 2    submitted in this case, the psychologist here notes, "Mr.
 3    Hightower appears to be best when he is in a structured
 4    situation in which expectations are clear."  That is the very
 5    definition of incarceration.  So that even on the
 6    rehabilitative point, the 3553(a) factor there, that cuts in
 7    favor of a more extended prison term.  Just to add,
 8    Ms. Cross-Goldenberg referenced that he was not receiving
 9    sufficient assistance at the MCC.  He will not be housed long
10    term at the MCC so that is pretty irrelevant to the
11    consideration here.
12              Finally, most importantly, the 3553(a) factor that
13    involves protection of the public from further crimes of this
14    defendant, what we see in the report, what we see in the
15    defense submission and what we hear from the defendant today is
16    truly terrifying.  This was a senseless crime, completely
17    senseless.  He goes outside, he has had a bad day and he picks
18    the victim who was simply doing her job.  She was delivering
19    the mail.  He somehow sees his father in this vulnerable victim
20    and approaches her from behind and begins a vicious assault.
21              He says here that when he sees his father, he wants
22    protection from harm.  When he sees his father's face that is
23    what he is violently reacting to.  He is protecting himself.
24    But she had no way targeted him.  She in no way provoked him.
25    She was doing her job.  She wasn't even facing in his
```

E276higs

1    direction, and he needs protection from harm.  He sees her.  He

2    targets her.  He nearly kills her.  Thank God in this case

3    there was an eyewitness who stopped the assault who broke the

4    blackout or however they want to define it because that attack

5    was proceeding and it was only after the eyewitness called out

6    and chased after him that he stopped.  We see from the

7    photographs submitted, from the letters that the victim

8    provided that this horrific attack caused permanent life

9    threatening injuries to the victim in this case and that was

10   after only a couple minutes of assault.  If that eyewitness

11   hadn't been there, she very well could have died.  When she

12   went to the hospital that night, the doctors weren't clear she

13   would make it through the night because of the brain swelling

14   she suffered.

15        What we have here is someone who by the psychologist's

16   own words has a serious problem with his temper.  He has

17   episodes where he irrationally angry and interprets a look --

18   someone rolling their eye, an accidental physical contact or

19   someone close to his personal space -- as a provocation and a

20   threat and he acts impulsively in response to that.

21        The report says that he reports he felt a flash of

22   range and attacked the victim in this case.  He says here that

23   he sees his father when he has some alcohol or when he has had

24   a bad day.  He has triggers that set him off.  And if you

25   happen to be the innocent victim in his path when one of his

E276higs

1    triggers is set off, then you could face the same sort of

2    violent response that the victim in this case felt.

3          The idea that in response to truly senseless violence,

4    we would reduce prison time so that he could somehow address

5    his deep psychological issues is the most senseless of all.

6    This is precisely the person that the public needs protection

7    from, someone who has no control over his emotional response

8    and is willing to inflict life altering physical damage to an

9    innocent person that just happens to be delivering mail on the

10   particular day that he decides he needs to respond to his

11   father's anger.

12         THE COURT:  Do you want to address the argument?  I

13   take all your points.  And this was, everyone agrees, a brutal

14   and senseless acts of violence; but why above the guidelines?

15   Why isn't that what is taken into account by the 14-point level

16   and the seven additional points and two additional points

17   doesn't that all reflect how serious it is?  And 41 to 51

18   months is at the top the range.  That is four years and three

19   months.  It is a pretty long sentence for assault.  So what is

20   it about this that makes the guideline range in sufficient?

21         MS. GAFFNEY:  First, the fact that the guideline range

22   considers the type of harm inflicted here, the serious bodily

23   injury and the fact that the B statutory enhancement applies is

24   relevant; but as the Second Circuit made clear in United States

25   v. Kay above-guideline sentence is appropriate where even where

E276higs

1    the guideline adequately considers the kind of harm suffered by

2    the victim.  Here it would be serious bodily injury.  The

3    Second Circuit said that it did not think that the guidelines

4    adequately considered the degree of harm that she suffered.

5           Now, under the guideline range it is serious bodily

6    injury that gets him to the enhancements, but what we're

7    talking about here is really a life sentence for this victim.

8    As she describes in her letter and as is clear from various

9    social science research, she is going to experience the

10   psychological trauma of this event for the rest of her life and

11   she will experience possibly the physical effects for the rest

12   of her life.  She described in her letter she has painful

13   headaches.  She has a bulging disk in her neck, shoulder.  She

14   has pain in left hand.  She has got insomnia.  She still hasn't

15   returned to work.  So one could experience serious bodily

16   injury of a broken arm and leg and that would heal within a

17   year.  But we're looking at physical and psychological trauma

18   that is going to last the rest of her life and that is

19   precisely the degree it -- her degree of harm is so extreme

20   that this guidelines range even with the enhancements doesn't

21   incorporate that, doesn't appreciate that and that is where an

22   upward variance would respond to that because he gets out in a

23   little over four years.  She spends the rest of her life

24   struggling with this.  So in that way, this is the case that

25   even though there are enhancements to cover the injuries, they

E276higs

1    don't sufficiently represent the kind of harm that she has

2    suffered here.

3           Furthermore, I think the purely senseless nature of

4    this crime suggests that is not incorporated in any the

5    enhancements here.  We don't have an enhancement for totally

6    random, unprovoked nearly deadly assault.  He didn't steal

7    anything.  He didn't target her because she had a personal

8    issue.  There was no underlying explanation.  Not that that

9    would excuse this level of violence, but we're dealing with

10   something that is just truly terrifying and how senseless it

11   was.

12          THE COURT:  Thank you.

13          One other question I have for Ms. Cross-Goldenberg is

14   that Dr. Drob's report is that in terms of getting the relevant

15   information from BOP is there some way to ensure that gets sent

16   along?  Is there a way to attach it to the record or PSR?

17          MS. CROSS-GOLDENBERG:  I do, your Honor.  I can e-mail

18   it to the Probation officer who wrote the presentence report.

19   My understanding is he is responsible for submitting the

20   materials to the BOP.  So we can ask him to submit it as well.

21   As I said, I don't think there is any type of treatment that

22   the BOP will offer him that will would be reflective intensive

23   counseling and therapy he needs that the report reflects and

24   that Mr. Hightower needs.

25          THE COURT:  The victim of this crime is here,

E276higs

1   Ms. Atkins.  I have read the letter that you submitted and the

2   other documentation.  I also have seen pictures from after the

3   assault of you.  If you would like to speak today, you may.

4   There is no pressure and it may be uncomfortable, but you are

5   welcome to.

6             MS. ATKINS:  Where would you like me to stand?

7             THE COURT:  Would you be able to come up to where the

8   microphone at the front table and try to speak into the

9   microphone?  Thank you.  You can sit or stand.  Whatever you

10  prefer.

11            MS. ATKINS:  Thank you.

12            THE COURT:  Your name is Lisa Atkins A-t-k-i-n-s?

13            MS. ATKINS:  Yes.  This is the second time I have been

14  in a courtroom in my lifetime.  I thank the Court for this time

15  and I ask you all to be patient.  I didn't decide until five

16  seconds ago that I was going to actually speak.  I figured I

17  would let my letter, pictures speak for themselves; but I have

18  heard a lot in here today from both sides and I know everybody

19  is here to do their job and represent their party.

20            I am not here for judgment.  That is up to God and the

21  judge to decide how much time Mr. Hightower is going to get.

22  That really was not any interest to me at all.  I will just

23  start by saying that I am a very independent, carefree loving

24  woman who worked extremely hard.  I don't have any children.  I

25  am not married.  So therefore I actually enjoyed my job.  I

E276higs

1   hate the cold, but I enjoyed my job.  This attack happened on

2   one of the coldest days in January.  I was literally at my last

3   point of delivery.  The very last of the day after being out

4   there all day.  It literally from that point to my station

5   takes me eight minutes.  By the time I finished my mail at the

6   job and clocking out, half an hour I would have been on my way

7   home.  Instead, I ended up in the hospital for four days.  By

8   the grace of God I don't remember any of it and I know that He

9   did that to protect me because I don't remember the first blow,

10  the last blow, anyway.

11          We're here not because Mr. Hightower turned himself in

12  or felt so guilty about what he did.  We're here because of

13  evidence, a witness and videotape.  That is why we're here.  I

14  understand that people have terrible childhoods, abusive

15  parents of all types, alcohol, what have you, drugs.  We all

16  have some of that in our lives.  But to do what he did, I had

17  to convince the detectives on my case that this was not

18  personal because the beating was so severe.  I had never spent

19  a day of my life in a hospital.  I have never had a broken

20  bone, fractures, stitches.  Never spent a day in a hospital.

21          What that did to my family and my friends hurt me more

22  than anything.  I can heal from my facial wounds, maybe even a

23  fracture; but I have bulging, herniated disks in my neck and

24  back because somebody had nothing else to do with his damn

25  time.  If you are upset at your wife, partner, kids, you take a

E276higs

walk.  You don't take a walk and beat the hell out of someone
who is literally doing their job.  He was at my back.  You
couldn't tell whether I was female or male because first of all
it is general.  I have on all of my gear.  My back is to him,
to the street.  I am on the street.  I wasn't even in the
building.  I am on the last point of my delivery, outside at of
a box.

          The worse thing about a postal worker is having
someone come from behind them, some people are constantly
reaching for the mail.  Let us finish.  It only takes a few
minutes.  If you don't have your key, show us your ID and we'll
give you your mail.  No problem.  This is not even his street.
You don't even live here.  So I know it is not a question of do
you have a package.  Do you have -- there was no reason for him
to approach me.  So therefore I don't know whether I turned and
I -- like I said, I don't even remember the first blow and I
thank God and nobody but God put that witness there.  Like my
attorney says that beating would have continued and one more
blow, one more kick, I have no idea whether I would be able to
see out of my eye or how much brain damage would have been
done.  God saw fit to put someone there that stopped that act.

          Like I said, he didn't call.  He didn't go to the
police station to say, you know, I did this terrible thing.  I
had a blackout.  I was angry with my partner or whomever.  I
had an episode and I need help.  As the testimony I heard

E276higs

1   testimony, there was plenty of time throughout his life for his

2   family, for himself and as an adult to go get proper help.  He

3   didn't do that.  Even when he had the opportunity to do it,

4   whether he finished the program or whatever the case may be.

5   You know, you mentioned that he has children.  If you don't do

6   it for yourself, do it for your children.  It is too many

7   fatherless children out here and you out here doing what you

8   are doing to a woman, and again he couldn't tell.  There is no

9   way he could have told I was a man or a woman.  I was short and

10  he towered over me.

11          I have been the healthiest in my life prior to this.

12  Like I said, I went to routine yearly physicals.  Eyeglasses,

13  dentist.  Never a root a canal nor toothache or cavities.

14  Because of my facial damage that Mr. Hightower did, caps with

15  root canal.  I didn't know what the hell that was.  I heard

16  about it, but to experience that and to all the healing that I

17  had to go through and still I never been to a psychiatrist.  I

18  have to go once a week.  Physical therapy, three times a week.

19          I don't have job that I had before that I actually

20  enjoyed.  I actually enjoyed by job.  The people on my route

21  knew me.  Never had a problem.  Never had a problem.  There is

22  nothing on my record.  I have done it for seven or eight years

23  and I actually enjoyed do.  I hated the cold, but I had the

24  right equipment on and any other day whether I need it, whether

25  summer or winter, I always had the proper gear on.  I don't

E276higs

 1    have any blemishes on my record.

 2            Now, I know physically, mentally I can never do that

 3    job again.  That changed everything.  I have no idea what

 4    course God is going to put me on, what kind of work I will be

 5    doing or able to do.  I look totally healthy right now, but

 6    tomorrow I have to go to physical therapy.  Next week I have to

 7    go see my psyche.  It's been an amazing, unbelievable year.

 8    Thirteen is a bad luck number.  It has been one hell of a year

 9    and I will never forget it.  The fact that I didn't start

10    remembering my -- my earliest memory of that event was late

11    February, which was not even now.  It was after Valentine's Day

12    of last year.  That is the earliest memory I have.  All the

13    rest is filled in blanks from family and friends.  They said I

14    was talking.  They prayed over me.

15            The only thing I wanted to do was see him for five

16    minutes.  I just wanted to sit down and talk to him for five

17    minutes.  I remember that.  Inspectors said, No, you cannot do

18    that.  Not to hurt him, but I knew that something had to happen

19    in this person's life because to know me you would never do

20    harm to me ever.  I am one of the kindest people you will meet.

21    I am the most giving person.  This hurt my family.  Those who

22    are abroad and here just to get the phone call that something

23    happened to me on my job, that somebody did harm to me, not

24    knowing whether I am going to make it through the night.  I

25    can't even imagine that kind of -- they can't get to me.  Only

E276higs

1    thing they could do is pray for me and I felt all those

2    prayers, I did, to this day.

3              I really do pray that Mr. Hightower gets the help that

4    he needs so that this never, ever happens to anyone else again,

5    not even a bump, to bump into someone just to have compassion

6    for someone.  To know what that truly means.  Even if you are

7    having those episodes, think of your children that if I can

8    complete this act that is going to take me away from my

9    children once again.  They don't deserve that.  They didn't ask

10   to be here.  They didn't ask to be here.  You brought them

11   here.  It is your job to raise them.  No one else should be

12   raising your children.  We have enough grandmothers out here

13   doing it.  Grandmothers, grandparents.  I think these days

14   aunts and uncles.  It is not fair to them.  It is not fair to

15   them.  I do pray that he gets the help that he needs.

16             I thank the Court for your time.  I truly do.  Thank

17   you so much.

18             THE COURT:  Thank you.

19             Is there any reason why sentence should not be imposed

20   at this point?

21             MS. GAFFNEY:  No, your Honor.

22             MS. CROSS-GOLDENBERG:  No, your Honor.

23             THE COURT:  In preparing the sentence, Mr. Hightower,

24   I have considered the presentence report, the recommendation of

25   the Probation Department, the written and oral statements of

E276higs

defense counsel, defendant, the government as well as the

victim and letters submitted on behalf of the defendant as well

as the psychological report.  I have considered each of the

factors set forth in 18, U.S.C., 3553(a).  These are all the

factors that govern my decision on sentencing.  They include

the nature and circumstance of the crime, the defendant's

history and characteristics, the need to reflect the

seriousness of the offense, provide just punishment, promote

respect for the law, afford adequate deterrence for criminal

conduct, to public protect the public, provide any needed

medical care or other correctional treatment to the defendant.

Also, the sentencing guideline provisions, the need to avoid

unwarranted sentencing disparities among defendants and the

need to provide restitution to the victim.

        I am required to impose a sentence under the law that

is sufficient but not greater than necessary to serve all of

those purposes and one of the hardest things I do and have to

do in this job is balance all of these different factors in

hard situations.  Firs, I am going to talk about the nature and

circumstances of this crime and tied in with that are what is

just punishment for the crime, seriousness for the crime and

the need for the sentence to reflect support and respect for

law.

        This was a serious crime as we've all heard here today

by its nature involving the assault of a federal worker who was

E276higs

just doing their job resulting in permanent bodily injuries,
life threatening injuries and in this situation it was a
particularly brutal, senseless act of violence.  The defendant
didn't know the victim or have any connection with she was
doing in her job.  The defendant punched her, knocked her to
the job and kicked her repeatedly in the face and head,
fractured her eye socket, broke her teeth, slit the flesh on
her face and inside her mouth and left her unconscious.  The
assault went on for two or three minutes and I think what is
disturbing is that it might have continued had it not been for
an eyewitness who apparently yelled at him and got him to stop
and run away.

          It might have continued to the point whereas the
victim has pointed out she could have had serious brain injury.
She could have lost her sight.  She could have been killed.  So
there is no question it is a serious crime.  The crime has
changed the victim's life.  She is not working.  She will not
be able to probably work in the same job which she liked.  She
is in ongoing physical therapy and counseling and other
treatment.

          I also need to consider the history and
characteristics of the defendant.  The defendant, it is clear,
had a difficult childhood.  It was chaotic.  He suffered
serious abuse from his father who physically assaulted him
during a time when the father was addicted to crack cocaine.

E276higs

1    The defendant also suffers from a sever psychological and mood

2    disorders and posttraumatic stress order probably as a result

3    of the serious abuse he faced as a child.  I do think it is

4    clear that he needs mental health treatment, intensive mental

5    health treatment.  He has a lot to work on.  It is also

6    essential to take into account the past violent behavior of the

7    defendant.  He has two prior convictions, both of which involve

8    violence in one way or another.  There is also a pending charge

9    which also is alleged to have involved violence, as well as an

10   order of protection.  I know there is a fuller story on orders

11   of protection, but it is something that involved potential

12   violence.  The second of the two convictions was only a year or

13   so before the incident in this case.

14          Now, this past violent behavior is relevant to the

15   history and characteristics of the defendant, but also two

16   additional factors I need to consider.  Significantly the need

17   to protect the public from future crimes of the defendant and

18   need for specific deterrence to prevent him from committing

19   these crimes again or other crimes.  These considerations I

20   think are heightened by the brutal and random nature assault in

21   this case.  It is clear that the defendant needs to be

22   incapacitated for some period of to protect the public.  The

23   question is what will be a sufficient period of time to protect

24   the public and deter him from committing crimes in the future.

25   This must be considered along with the treatment that he needs.

E276higs

1    I don't believe that it is justified in this case to

2    give him a shorter sentence on the theory that he should get

3    treatment as soon as possible as a condition of supervised

4    release because the risk of future violent behavior and the

5    need to protect the public are too great.  I do intend to

6    recommend that he be given treatment while in the Bureau of

7    Prisons and that he be given treatment while on supervised

8    release following his release.  I do note, as the government

9    pointed out, that in Dr. Drob's report indicating that he has

10   serious issues and struggles, but there were two things in

11   there that I do think in addition to the need for

12   incapacitation and protecting the public support a significant

13   jail term.  One is the structured environment that I think may

14   help him in some ways and the second things is there is a

15   reference to aging out of some of the behaviors as someone gets

16   older.  I think the incapacitation for a period of time even if

17   it is not the ideal treatment available at the Bureau of

18   Prisons serves a purpose of spending a period of time where

19   hopefully some of the behaviors with treatment in the BOP will

20   become less of a likelihood in the future.

21        The guidelines are something I also need to consider.

22   As you know they are a starting point, but I am not bound by

23   them.  The government asks that I impose a sentence above the

24   guidelines.  The guidelines provide for 41 to 51 months'

25   incarceration.  51 is four years and three months.  That does

E276higs

1    reflect the seven-point increase for permanent and

2    life-threatening injuries and a two-point increase because of

3    the statutory provision involved and the infliction of bodily

4    injury.

5              At the end of the day, I believe that a sentence on

6    the high end of the guideline range is appropriate.  I think

7    the high end is appropriate because of the particularly brutal

8    and senseless nature of assault here as well as the past

9    violent behavior and risk of future violent crimes.  I

10   ultimately believe that the brutality is taken into account by

11   the guideline calculation although at the top of the range.

12   For this reason I intend to impose a sentence of 51 months'

13   incarceration.  It will be followed by three years of

14   supervised release.  I am not going to impose a fine because I

15   don't believe he has the ability to pay one, although there is

16   a $100 special assessment and I am going to order restitution

17   to the victim in the amount of $7,573.

18             Does defense counsel know of any legal reason why the

19   sentence may not be imposed as stated?

20             MS. CROSS-GOLDENBERG:  No, your Honor.

21             THE COURT:  Does government counsel?

22             MS. GAFFNEY:  No, your Honor.

23             THE COURT:  Mr. Hightower, please stand.

24             It is the judgment of this Court that you be committed

25   to the custody of the Bureau of Prisons for period of 51

E276higs

months.  Following release you will be placed on supervised
release for a period of three years with the following
conditions:  You will not commit a federal, state or local
crime.  You will not illegally possess a controlled substance.
You will not possess a firearm or destructive device.  You will
refrain from the unlawful use of controlled substances.  You
will submit to one drug testing within 15 days of your
placement on supervised release and at least two unscheduled
drug tests thereafter as directed by Probation.  You will
cooperate in the direction of DNA as directed by the Probation
officer.

        The standard conditions are imposed with the following
special conditions:  The defendant will participate in a mental
health program approved by the U.S. Probation Office.  The
defendant shall continue to take any prescribed medications
unless otherwise instructed by the healthcare provide.  The
defendant will contribute to the cost of services rendered not
covered by third-party payment if the defendant has the ability
to pay.  The Court authorizes the release of psychological and
psychiatric evaluations and records to the healthcare provider.
The defendant shall provide the Probation officer with access
to any requested financial information.  The defendant shall
not incur any new credit charges or open additional lines of
credit without the approval of Probation, unless the defendant
is in compliance with the installment payment schedule.  The

E276higs

1    defendant will report to the Probation Office within 72 hours

2    of release from custody.

3         Further, I order that the defendant shall pay to the

4    United States a special assessment $100 due immediately and it

5    is further ordered that the defendant shall make restitution

6    payable to the clerk U.S. District Court for payment to the

7    victim, 500 Pearl Street, New York, New York for disbursement

8    to the victim in the amount of $7,573.

9         If the defendant is engaged in BOP the nonUNICOR work

10   program, he shall pay $25 per quarter toward the criminal

11   financial penalties.  If he is in the BOP UNICOR program, he

12   shall pay 50 percent of his monthly UNICOR earnings toward

13   financial penalties.  The restitution shall be paid in monthly

14   installments of 10 percent of gross monthly income over the

15   period of supervision commencing 30 days after the date of

16   judgment or after the date of release from custody.  The

17   defendant shall notify the U.S. Attorney of this district

18   within 30 days of any change of mailing or residence address

19   that occurs while any portion of restitution remains unpaid.

20   The fine is waived in this case.  However, as I said, there is

21   a $100 special assessment.

22        I will make the following recommendations to the

23   Bureau of Prisons:  First, that the defendant provide all

24   appropriate medical treatment, including mental health

25   evaluations and treatment that the Bureau of Prisons,

E276higs

1    specifically consider Dr. Drob's report in considering him for

2    any mental health treatment and conducting such treatment and

3    evaluations.  Also, that he be considered for placement in the

4    residential drug and alcohol abuse programs with Bureau of

5    Prisons.

6           Mr. Hightower, you have a right to appeal from your

7    conviction and sentence accept to whatever extent you have

8    validly waived that right as a plea agreement.  If you are

9    unable to pay the cost of appeal, you can file a leave for

10   appeal in forma pauperis.  Any appeal must be filed within 14

11   days of judgment.  I am directing that a complete copy of the

12   presentence report be provided to the Bureau of Prisons and

13   Sentencing Commission.  Counsel on any appeal will have access

14   to the report.  The clerk will prepare the judgment and see to

15   it that the required documentation is sent to the Sentencing

16   Commission.

17          Is there any underlying count that needs to be

18   dismissed.

19          MS. GAFFNEY:  No, your Honor.

20          THE COURT:  Anything further?

21          MS. CROSS-GOLDENBERG:  No.  I just have a couple quick

22   things, your Honor, with respect to the Court's recommendation

23   if the Court would also recommend that he be designated to a

24   facility in Pennsylvania.  I think I mentioned Allenwood and

25   Schuylkill in my letter -- I can spell that for the court

E276higs

1  reporter after if you want -- to facilitate family visits and

2  rehabilitation.  I can't recall if the Court said this or not,

3  that he be supervised in the district of his residence, which

4  we expect will be with his parents in Pennsylvania.

5          THE COURT:  Yes.  If I didn't make that clear, I am

6  going to order that he be supervised by his district of

7  residence upon supervised release.

8          MS. CROSS-GOLDENBERG:  Thank you, your Honor.

9          THE COURT:  I will make the recommendation to

10  Allenwood or --

11          MS. CROSS-GOLDENBERG:  Allenwood and I think you

12  pronounce it Schuylkill, S-c-h-u-y-l-k-i-l-l.

13          THE COURT:  I will recommend to the Bureau of Prisons

14  that he be placed in a facility in Pennsylvania, which may

15  include Allenwood or Schuylkill if it is an appropriate

16  designation.

17          MS. CROSS-GOLDENBERG:  Thank you, your Honor.

18          The final point, and I know this is a very convoluted

19  issue in terms the law, as the Court knows he has an open state

20  case, which he is contesting and has pled not guilty, but I

21  would ask that the Court, I am told the magic language is,

22  designate a state facility for the service of his federal

23  sentence so that will permit his federal sentence to continue

24  to run even if he is held in the state custody.  Otherwise, as

25  I understand it his BOP will not credit him with my time when

E276higs

1    he is being transported back and forth and there is no way how

2    much time will be lost because of that.

3                 THE COURT:  This would only be a recommendation?

4                 MS. CROSS-GOLDENBERG:  Exactly.

5                 THE COURT:  The recommendation would be that?  What is

6    the language?

7                 MS. CROSS-GOLDENBERG:  That they designate a state

8    facility for the service of his federal sentence and that would

9    simply allow the clock to continue to run on his federal

10   sentence even while he is -- for example, if he is produced on

11   a writ to state court or while he is being transported back and

12   forth, it will allow his time to continue to accrue.

13                THE COURT:  Is there any objection to that?

14                MS. GAFFNEY:  No objection, your Honor.

15                THE COURT:  I will recommend that the BOP recommend a

16   state facility as a federal place of incarceration for service

17   of his federal sentence.

18                MS. CROSS-GOLDENBERG:  Thank you, your Honor.  We

19   appreciate that.

20                THE COURT:  Anything further?

21                MS. GAFFNEY:  Your Honor, Mr. Skolnik raised this

22   procedural issue.  We had an original indictment in this case

23   that had a typo.  It charged 111(a)(1) and (2) and what it

24   should have read was 111(a)(1) and (b).  The superseding

25   indictment corrected that typo.  I don't know if I need to move

E276higs

| | |
|---|---|
| 1 | to dismiss formally move to dismiss (a)(2); but in case I do, I |
| 2 | move to dismiss (a)(2). |
| 3 | THE COURT:  There was an underlying indictment? |
| 4 | MS. GAFFNEY:  Yes. |
| 5 | THE COURT:  So we should just to be sure dismiss that |
| 6 | underlying indictment? |
| 7 | MS. GAFFNEY:  Yes. |
| 8 | THE COURT:  On and application that application is |
| 9 | granted and underlying application is dismissed. |
| 10 | Anything further? |
| 11 | MS. GAFFNEY:  Not from the government.  Thank you. |
| 12 | THE COURT:  Anything further? |
| 13 | MS. CROSS-GOLDENBERG:  Nothing from us.  Thank you. |
| 14 | Your Honor. |
| 15 | o0o |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |